## GEORGE BREHM *vs.* SPERRY, JONES & CO. ET AL.

*Consolidation of Corporations—Alleged Overissue of Securities to Pro-
moters—Construction of Contract—Specific Performance—Remedy
at Law.*

Plaintiff was the owner of a brewery in Baltimore, and the defendants
were the promoters of a consolidation of certain breweries by the for-
mation of a new corporation, called the Maryland Brewing Co., to take
over their business. A contract was made between plaintiff and de-
fendants, by which the latter agreed to use their best efforts to effect the
proposed consolidation by a given time, and the plaintiff agreed to sell
his brewery for $450,000 in cash, $100,000 in bonds and $500,000 in stock,
common and preferred of the Maryland Brewing Co. It was provided that
the amount of the securities of the new company to be issued should be
based upon the annual output in barrels of beer of the constituent brew-
eries. This output was estimated to be 700,000 barrels a year, and it
was agreed that if the annual barrelage should be less that then there
should be a proportionate diminution in the amount of the securities to
be issued. The compensation of the defendants was to consist of all
the stock and bonds which should be left after paying the purchase
price of the different companies entering the consolidation. It was also
stipulated that plaintiff's son should be employed as a manager of the
new company for ten years, and this employment was made a condition
of plaintiff's agreement. Plaintiff conveyed his brewery and received
the money and securities mentioned in the contract. A year afterwards
plaintiff filed the bill in this case setting forth said contract and the
transfer of his property in pursuance thereof, and alleged that the total
output of the constituent companies of the Maryland Brewing Co. was
not 700,000 barrels per year as had been estimated, but was only 575,000
barrels, and that according to the provision in the agreement relating
to the amount of the securities to be issued, based on the annual barrel-
age, the total amount of stock and bonds to be issued should have been
$11,500,000, whereas in point of fact securities to the amount of
$12,803,000 were issued, making an overissue of $1,303,000. The bill
alleged that this overissue caused the bonds and stock delivered to the
plaintiff for his brewery to be less valuable than they would have been
if the contract had been complied with, and prayed that the defendants
be required to return to the Maryland Brewing Co. the overissued secur-
ities or to pay for the same in money. Upon demurrer to the bill. *Held,*

1st. That the plaintiff is not entitled to the relief asked for, because the
contract is not one proper to be specifically enforced in its entirety by
either party ; and plaintiff's construction of it in the bill is of doubtful
accuracy ; also because plaintiff entered into the consolidation by the

transfer of his brewery after knowing, or having the means of knowing, that the output of the constituent breweries was less than was estimated in the contract, and has delayed for a year to make any objection, after accepting benefits under the contract and inducing other parties to change their position ; and also because the bill does not allege that the plaintiff is still the holder of any of the bonds and stock issued to him and alleged to have been injuriously affected, or has any present interest in requiring the defendants to transfer the alleged overissue or to pay money to the Maryland Brewing Co.

2nd. That the plaintiff is not entitled to compensation in lieu of specific performance since his damages, if any, may be ascertained in an action at law as well as by reference to an auditor.

Appeal from a decree of the Circuit Court of Baltimore City (DOBLER, J.), sustaining a demurrer to the bill of complaint and dismissing the same.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Bernard Carter* and *William S. Bryan, Jr.*, (with whom was *D. Meredith Reese* on the brief), for the appellant;

As to the adequacy of a remedy at law, it is submitted that none exists by which plaintiff can obtain full relief, and that equity has jurisdiction of the case made by the bill. *Sullivan* v. *Tuck*, 1 Md. Ch. 64; *Equitable Gas Co.* v. *Balto. Coal Tar Co.*, 63 Md. 299; *Gottschalk* v. *Stein*, 69 Md. 56; *Wright* v. *Bell*, 5 Price, 325; *Bomgardner* v. *Leavitt*, 12 L. R. A. 776; *Treasurer* v. *Commercial Mining Co.*, 23 Cal. 390; *Chamberlin* v. *Blue*, 6 Blackf. 491; *Benefit Association* v. *Sears*, 114 Illinois, 108; *N. E. Trust Co.* v. *Abbott*, 162 Mass, 148, 154; *Gloucester Isinglass Co.* v. *Russia Cement Co.*, 154 Mass. 92, 97; *Floyd* v. *Storrs.*, 144 Mass. 56; *Ross* v. *U. P. R. R.*, 4 Woolworth Rep. 34; *Phillips* v. *Berger*, 2 Barb. 608, 610, 611; *Same case on Appeal*, 8 Barb. 517; *Bristol* v. *Bristol & Warren Water Works*, 32 L. R. A. 740; *Adams* v. *Messinger*, 147 Mass. 185; *Frue* v. *Houghton*, 6 Colorado, 318.

Let us apply the principles of these cases to the case at bar. Brehm was entitled, under his contract with Sperry, Jones & Co., to receive a certain number of bonds and shares of stock.

Let us assume, for the sake of the argument on the demurrer (but only for the sake of this argument on the demurrer), that the learned Judge below is correct in his construction of the contract and of our bill; and that it is true that the issue of securities authorized was $12,000,000, and not, as stated in the bill, only $11,500,000. Let us further assume, for the sake of argument only, that the learned Judge is correct in his deduction that the overissue was only in the bonds, and not in the stock. This will not affect the question on demurrer, or tend in any way to show that Mr. Brehm is not entitled to relief, although, of course, it might affect the extent of the relief and the money value of the final decree.

The value, both ¦of the bonds and of the shares of stock, would be seriously affected by the number to which the issue of bonds was restricted. ·A most important element to be considered in determining the value of both the stock and bonds was the ability of the corporation to pay the interest on the bonds as it accrued, and to redeem them at maturity. If it could not do this, and if a foreclosure of the mortgage securing the bonds was to be had, the value of both bonds and stock would be greatly impaired and put in jeopardy, because the value of both stock and bonds was controlled by the public confidence in the company's maintaining itself as a going and dividend-earning concern. When the number of bonds was less, the probabilities of the Brewing Company being able to meet its fixed charges, and then pay dividends on its stock were, of course, much greater. The, increase, therefore, of the issue of bonds beyond the contractual limit was a very serious injury to the value of both the bonds and of the underlying stock held by Brehm. This overissue of bonds not only decreased the actual or book value of both Brehm's bonds and stock, but it also decreased materially the market value of each of them, but to what exact extent no man can definitely and precisely tell.

We say it is impossible for anyone to say how much the market value of either the stocks or the bonds has been diminished by the overissue of the bonds. This would depend

in part upon the book value which would have been given to
the remaining bonds and stock if the overissue had not been
made.    It would also depend in part upon the additional
amount of public confidence which would have been given to
these securities by the knowledge that the fixed charges of
the company were that much less, and that the chances of the
company being able to earn sufficient to pay interests and div-
idends, and provide a sinking fund would have been greater.
The whole matter would be at the best a conjecture.    If
Brehm had sued Sperry, Jones & Co., at law for a breach of
the contract of purchase, the best the jury could have done
would have been *to guess* at the difference between the market
value of the bonds and stock delivered, and what would have
been the market value of the stock and bonds of the charac-
ter and description agreed to be delivered.

Suppose an action at law brought by the plaintiff to recover
damages for the failure to perform the contract ; in this action
the plaintiff would have to show not only that the bonds and
stock were made *less valuable*, because of the overissue, but
he would be obliged to show *how much less valuable* they had
been thereby made.    This definite ascertainment of the dimi-
nution in value would have to be made as of some particular
time, (perhaps as of the time of the overissue, or of the time
of suit brought, or as of time of trial ;  but for the present it
is not material to ascertain at what time.)    Let us suppose,
*ex gratia argumenti*, that the time would be that of suit
brought.    How would the plaintiff have to proceed to estab-
lish the definite quantity of diminution in value, so that the
jury would make it the basis of their verdict ?    He would first
have to start with proving the then market value of the bonds
and stock, with the existing issue of bonds and stocks, and
then he would have to show that this market value had been
diminished by the overissue, and then to show *the extent in
dollars and cents*, of that diminution.    Suppose he called for
this purpose persons acquainted with the business condition
of the company, and with brewing business in the city of Bal-
timore, and with the market for the bonds and stocks, and

asked them to what extent the market value of the bonds and stock had been diminished by the overissue? How could they intelligently estimate and declare the amount in dollars and cents of this diminution? Is it not too clear for denial, that many things, besides the *quantum* of the bonds of the company outstanding, would determine the market value of the bonds and stock; that is to say, among other causes, would not the character of the management of the business; its present and future prospects; the extent of the competition of other breweries; the general financial and industrial condition of affairs, and the changes, which may have occurred in all of these matters since the issue of the bonds and stock, largely enter into the question of the value of the bonds and stock at the time of the suit brought? If this question is to be answered in the affirmative, as it must be, how could any witness really segregate, out of these causes affecting the market value of the bonds and stocks, the effect produced on said market value by the overissue, and say its effect on the then market value of the bonds and stocks is to be measured by so many dollars and cents as to each share of stock and each bond owned by the plaintiff? We submit, therefore, that neither witness nor jury can do more than conjecture and guess at the amount of diminution in the value of the bonds and stocks caused by the overissue in question. This being true, the cases above cited show that the plaintiff can have no such adequate remedy by an action at law as would oust the jurisdiction in equity.

Brehm was, however, entitled to receive the specific thing contracted for from Sperry, Jones & Co. He was not obliged to sell this specific thing to them at a price which a jury should guess would compensate him. He desired to remain in the brewery business and to participate in the profits of the enterprise started on the terms agreed upon between Sperry, Jones & Co. and himself. He could not realize this wish nor attain this purpose without the possession of the specific bonds and stock of the character and in the condition prescribed by his contract with Sperry, Jones & Co. The fact that for the

Court to require them to keep their contract, and to prevent them from, in fraud of the rights of Brehm, enjoying themselves, the fraudulent overissue of bonds, would entail a heavy loss upon them; or, to speak more correctly, would prevent them from making a large but unlawful profit out of the transaction, is, it is submitted, an odd argument to address to a Court of equity. Brehm has a right to compel Sperry to keep his contract, be the cost to Sperry of keeping his word much or little.

In considering any supposed hardship on Sperry, Jones & Co. in compelling them to make restitution of these bonds, it is to be borne in mind that by their contract with Brehm they had agreed not only as to the character and amount of bonds and stock in the Maryland Brewing Company which were to be issued, but they had also agreed that their *sole* compensation for their services as promoters and for $500,000 cash furnished for working capital should be the amount of stock and bonds of the new company not necessary to pay for the constituent breweries.

If Sperry, Jones & Co. are compelled to surrender all the stock and bonds which they have " taken and carried away," over and above the amount which they had a right to under their contract with Brehm, they will simply be compelled to receive as compensation for their services as promoters the exact reward which was agreed to be paid them. It has never before been considered inequitable that a man should not be permitted to receive without the consent of the other party to the contract a greater compensation for his labor than he agreed to accept.

It was suggested in the Court below that the bill should have averred that Mr. Brehm still possessed all the stock and bonds acquired from Sperry, Jones & Co. The force of this suggestion is not perceived. It is a little difficult to see how it would affect the case if Brehm had disposed of a portion of his stock or bonds. If it could in some undisclosed way affect Sperry, Jones & Co.'s liability if Brehm had disposed of some of his bonds or some of his stock, that fact would be

a matter of defense to be set up in the answer, and proved by
the defendant. It would not have been either usual or neces-
sary for us to have averred a negative.

It is abundantly settled, both on reason and authority, that
it being shown that Brehm once held the bonds, the presump-
tion would be that he continued to hold them until the con-
trary appeared. A party elected to an office is presumed to
continue in it until the contrary is shown. *Steward* v. *Dana*,
12 Mees. & Wels. 655. A seisin once proved is presumed to
continue. *Brown* v. *King*, 5 Metc. 173. The relation of
partnership once established is presumed to continue. *Alder-
son* v. *Clay*, 1 Starkie, 405; 1 *Greenleaf on Evidence*, sec. 42.
So a person's residence or legal domicil is presumed to con-
tinue in the place it is proved to have been until the contrary
is shown. *Mitchell* v. *United States*, 21 Wallace, 353. See
also *Somerville* v. *Somerville*, 5 Vesey, 787; *Rex* v. *Budd*, 5
Espinasse, 230; *Randolph* v. *Easton*, 23 Pick. 242. In *Ham-
mond* v. *Inloes*, 4 Md. 172, it is said : " It is a general pre-
sumption that things once proved to have existed in a particular
State are understood as continuing in that State until the con-
trary be established by evidence, either direct or presumptive.
Thus where seisin of an estate has been shown its continuance
will be presumed."

If for any reason which does not occur to us, the Court
should be of opinion that the special relief prayed by us should
not be granted, it might be asked by the learned counsel for
the appellee, as it was asked in the Court below, *what* relief
we could obtain under the prayer for general relief ? In
answer we say, that, in our judgment, the relief specially
prayed in the bill is the most appropriate, but that if for any
unperceived reason, we should be so unfortunate as to have
this Court differ with us, that, then, we should have such relief
as to the Court should seem equitable. Not intending thereby
to exclude any other or different form of relief which the
Court might consider more appropriate, we may, by way of
illustration, suggest that, in analogy to cases where specific
performance of a contract to convey real estate will not for

any reason be granted, the Court could decree us *compensation* either directly in a decree or after referring the matter to an auditor.  *Powell* v. *Young*, 45 Md. 497.

*Edgar H. Gans* and *W. Calvin Chesnut* (with whom was *B. H. Haman* on the brief), for the appellees:

The plaintiff alleges, in substance, upon his transferring his brewery property to the Maryland Brewing Company, a positive obligation on the part of the appellees to give him $450,000 in cash, and in addition $100,000 in bonds and $500,000 in common and preferred stock in this new consolidated corporation, to wit, the Maryland Brewing Company, about to be formed by Sperry, Jones & Co., and that the value of these bonds and stock were to be fixed and ascertained by limiting the total issue of bonds and stock in accordance with certain rules.

All the rest of the bill is matter of detail claiming rights founded upon this essential construction of the contract, and unless the contract can be construed in this way amounts to nothing.  Accordingly he alleges that by the contract the consolidation was to have in stock and bonds an authorized capitalization of $14,000,000, predicated upon an annual barrelage of 700,000 barrels at $20 per barrel, to be divided as follows : $7,500,000 of bonds, $3,250,000 of preferred stock, and $3,250,000 of common stock.  But as it was not certain how much barrelage could be secured by the consolidation, it was provided that the consolidation should take place if an annual output of 560,000 barrels could be procured.  This made it necessary to fix the amount of bonds and stock which could be issued on the supposition that less than 700,000 barrels of output annually were secured.  The rule fixed by the contract was as follows : Take the actual barrelage secured (which must be at least 560,000 barrels), and deduct this from the 700,000 barrels.  This will be the shortage.  Capitalize this shortage at $20 per barrel.  From the capitalization so secured deduct all cash working capital and its equivalent in stock of beer, materials, etc.  Then subtract this sum from the original

capitalization of $14,000,000, and the remainder ratably distributed between bonds and stock will give the authorized issue of stocks and bonds.

Having stated his construction of the contract and the rule for estimating the authorized issue of stock and bonds, the appellant proceeded to state his specific grievance. He alleges that the total output of the constituent breweries in the consolidation was only 575,000 barrels annually; that according to the rule just stated, the authorized issue of stock and bonds should be—bonds, $6,175,000; preferred stock, $2,662,500; common stock, $2,662,500; total, $11,500,000. Whereas, as matters of fact there were really issued—bonds, $7,303,000; preferred stock, $2,775,000; common stock, $2,775,000; total, $12,803,000. Making an overissue of—bonds, $1,128,000; preferred stock, $87,500; common stock, $87,500; total, $1,303,000, and that therefore the $100,000 in bonds and $500,000 of preferred and common stock which he received when he turned over his brewery property were less valuable than they would have been if the contract had been complied with. The appellant does not state when he turned over his brewery property and received the consideration, *i. e.*, cash, stock and bonds, but this was undoubtedly about *March 1, 1899*, for the contract was predicated upon the consolidation being consummated at that time.

The bill was filed *April 5, 1900*, more than a year afterwards. Now, although the bill states that appellant received these stocks and bonds as part of his consideration, *the bill nowhere states that at the time of the filing of the bill* the appellant owned *a single one of these bonds or a single share of this stock*. The appellant shows in the bill, that the stock and bonds issued to Sperry, Jones & Co., were issued by virtue of agreements between Sperry, Jones & Co. and the Maryland Brewing Company, by which Sperry, Jones & Co. turned into the Maryland Brewing Company all the property of the constituent breweries for the stocks and bonds. There is no other explanation given in the bill for the issuance of any stock or any bonds.

The appellant, after thus stating how the stock and bonds received by him had their value injured by the alleged over-issue, proceeds to say that the only way to do exact justice is to require Sperry, Jones & Co. to return the overissued stock and bonds to the Maryland Brewing Company, and accordingly he makes written demand on the appellees to turn over to the Maryland Brewing Company this $1,303,000 of securities, and a demand on the Maryland Brewing Company to receive them.

But here the appellant struck a snag, for the Maryland Brewing Company replied, that they did not intend at that time to take any affirmative action in reference to the matters at issue between appellant and appellees, "nor has this company any controversy with Sperry, Jones & Co.," etc. Of course not, as the company had issued its stock and bonds to Sperry, Jones & Co. for the constituent breweries and cash, and the matter was closed between them.

The appellant then proceeds to ask for the extraordinary specific relief, that appellees be obliged to turn over to the Maryland Brewing Company this $1,303,000 in securities (which the Maryland Brewing Company in effect say do not belong to them and which they do not claim) or their value, and in aid of this specific relief, an injunction and receiver to tie up the securities in the meantime in appellees hands, and then a prayer for general relief.

*The appellant stands alone as sole party plaintiff.* The relief he asks is not for himself, but for the Maryland Brewing Company. He asks that $1,303,000 of securities or their value be turned over by the appellees to the Maryland Brewing Company. Suppose this were done, how would it benefit the appellant? If at the time of filing the bill he held the stock and bonds originally delivered to him as part of the consideration hereinbefore set forth, the value of his stock would be enhanced by the increase of the assets of the Maryland Brewing Company. But it no where appears in the bill that he, at the time of its filing, *retained a single share of his stock or one of his bonds*, and if he were not then a stockholder it would not

help him to increase the assets of the Maryland Brewing Company a thousand fold.

The absence of this allegation is fatal; for if not a stockholder of the Maryland Brewing Company there is no possible relief which equity could give him under this bill. It was urged below, but we think not seriously, that the allegation showing the appellant to have received stock at the time he transferred his brewery, amounted to a statement that he held it more than a year afterwards by force of the presumption that a thing once shown to exist is presumed to continue to exist until the contrary is shown. This presumption as to the *fixity of things*, does apply to things which are in their nature stable, such as seisin of real estate, but no authority has ever applied it to the ownership of industrial securities which constantly fluctuate in value.

Of course the appellant has no right to enforce in this suit any right the Maryland Brewing Company may have against Sperry, Jones & Co., because (*a*) he does not show himself to be a stockholder, (*b*) even if he did, no demand on the corporation to bring suit and wrongful refusal is shown, and (*c*) from the bill itself, it is very evident that the Maryland Brewing Company has no claims against the appellees and is not making any.

The plaintiff could not under any aspect of the case have been damaged more than a few thousand dollars. Although this is so, he seeks to have the defendants lose nearly a million dollars. The defendants must pay a million because plaintiff claims to have lost a few thousand, and the attempt to bring this unconscionable result about is done under a bill for specific performance. "In specific performance the foundation and measure of the jurisdiction is the desire to do justice, which the legal remedy would fail to give. This justice is primarily due to the plaintiff, but not exclusively, for the equities of the defendant are also protected. Specific performance is, therefore, a conscious attempt on the part of the Court to do complete justice to both the parties with respect to all the judicial relations growing out of the contract between them." *Pom. Eq. Jur.*, section 1401, note 2.

*Appellant, on his construction of the contract, would have an adequate remedy at law.*   The alleged overissue is of bonds only.   It is, of course, clear that the value of stock in a corporation is decreased as its bonded debt is increased.   There are many causes which lead stock to fluctuate in value.   But in this case the appellant complains only of the decrease occasioned by the overissue of bonds.   If this is the only case attempted to be made, the measure of damage would be clear.   Take an illustration with simple figures.   Suppose appellant were to contract for $10,000 par of stock in a corporation with $100,000 capital stock, and the agreement was that the bonded issue should be $20,000.   Suppose further, there was a bonded issue of $25,000, being an overissue of $5,000 ; how would the appellant be hurt?   Evidently, the proportion of the increase which his stock bore to the total issue of stock.   As the whole stock would be hurt $5,000, and as he has one-tenth of the stock, he would be hurt $500.   This seems a simple measure of damage, and is the one declared by the Court below.

We now propose to endeavor to show that appellant's construction of the contract, as stated in his bill, is *fundamentally erroneous*, and that upon a true construction of the contract, taken in connection with the facts stated in the bill, the appellant is not entitled to any relief, either in law or equity.   It is well settled that, when a written contract is the basis of the plaintiff's equity and is filed with the bill as an exhibit, the allegations of plaintiff as to his construction of the contract are not admitted by the demurrer, nor are any facts stated, based upon such construction, if the construction of the plaintiff is erroneous.   *Ryan v. McLane,* 90 Md; *Gusdorff v. Schleisner,* 85 Md. 360; *Miller Eq. Prac.*, sec. 133.

There are two very different and distinct methods of bringing about a union of industrial interests by a promoter.

1. If the interests (breweries) are owned by individuals and corporations, the union may be brought about by the *consolidation* of the *corporations*, and the purchase by the *consolidated corporation* of the breweries from the individuals, under one

*uniform scheme,* applicable to corporations and individuals alike.   In this method the promoter secures *identical contracts* from all the constituent members (except as to the prices to be paid them), binding them to the details of the uniform scheme. When he succeeds in bringing about this kind of amalgamation he may stipulate that the consolidated corporation should have an authorized capitalization, and that for his services he should have whatever securities remain after paying the constituent members of the amalgamation what they respectively agreed to take.   This is evidently the plan contemplated by the contract.

2. The other method is that by which the promoter takes all the risks, buys outright by independent contracts all the breweries he wants on the best terms he can get, and then transfers them all as his own property to a corporation formed by him for the stocks and bonds of the new company, which he then uses to pay for his purchases.  In this method there need be no uniform scheme, the relations of the parties being fixed by the terms of their respective contracts, which may be very different from each other not only as to the price to be paid but as to what is embraced in their respective sales.   In this method the promoter secures his profit by the difference between the securities issued to him by the new corporation and the amount of those securities which he is obliged to use to pay for his purchases.   Now it is just as evident from the bill that this latter was the plan really put into execution, and not the plan outlined in Plaintiff's Exhibit A, which must have been abandoned.                                          .

The appellant claims by his construction of the contract that the appellees were under the absolute obligation to give him certain cash, bonds and stocks for his brewery.   His whole case rests upon this construction, and his complaint is that he did not get stocks and bonds of the value contracted for.   An examination of the contract will show that no such construction is tenable ; that there was no absolute obligation on the part of Sperry, Jones & Co. to give him anything for his brewery.   On the contrary, the most striking feature of the contract is that its *obligations are all conditional.*

*What was the obligation of the appellant?*   Was he obliged to sell his brewery to the new concern for $450,000 cash, $100,000 in bonds, and $500,000 in stock?   Obviously not. His obligation is found in the contract.   "The party of the first part" (appellant), "in consideration of the premises and of the covenants of the parties of the second part" (appellees), "hereinbefore mentioned, covenant with said parties of the second part" (appellees), "that if they shall succeed on or before March 1, 1899, in procuring such consolidation, and the formation of a consolidated corporation upon the terms of consolidation hereinbefore mentioned," etc., etc., then the party of the first part agrees, etc., (here follows his covenants to convey his brewery, etc.)   And he further covenants "that he will accept as his consideration for said conveyance and delivery the sum of $1,050,000 payable stock, and $450,000 cash, $100,000 in bonds, $250,000 in preferred stock, and $250,000 in common stock of said consolidated corporation."

Now the main question in this branch of the case emerges : Did the appellees succeed in their efforts ?   Did they perform the condition upon which alone, under this contract, the obligation of the appellant was transformed from a conditional option to an absolute covenant?   Did they form a consolidation on the terms marked from "a" to "l?"   If they did not, then appellant was never obliged to transfer his brewery, and if he did so, the transfer was obviously outside the contract.

These questions involve an examination of the plan of consolidation proposed.   The essential features are: 1. That a certain number of persons and corporations specially named, should combine.   That the corporations should be consolidated under general laws of Maryland into a consolidated corporation, to which, in addition, the brewery properties of individuals entering the combination should be conveyed, all getting cash or bonds and stock of the consolidated corporation for their properties, in accordance with contracts made between them respectively and the appellees. .

2. That the consolidation should be operative if at least 560,000 barrels of beer be produced by constituent members

annually.    That the capital stock should be $6,500,000, one-half thereof preferred stock, with 6 per cent cumulative dividends.  That 6 per cent gold bonds, not exceeding $7,500,000, might be issued, secured by a mortgage providing for a sinking fund of 1 per cent *per annum.*

3. That the capitalization of $14,000,000 is predicated on annual output of 700,000 barrels of beer, and the securities to be decreased, if less than 700,000 barrels, in accordance with rules already discussed.    That appellees to have for their services what securities are left after paying constituent members and costs of consolidation.

4. *Each of the constituent corporations and individuals* were to deliver certain property described, including 20 per cent of their annual sale of beer, and were allowed to retain such valuable property as—(*a.*) Property used by the breweries for saloon and dwelling purposes.  (*b.*) Cash on hand or in bank.  (*c.*) Amounts to their credit in Brewers' Exchange. (*d.*) Interest in Brewers' Exchange building.  Thus a uniform rule was prescribed as to what property should go to the new corporation and what should not, binding on each and all alike.

It therefore clearly appears that there is no allegation of any kind in the bill that the plan proposed was ever successfully carried out by the appellees, and that, therefore, so far as the bill goes, none of the positive obligations of the contract ever arose.    But not only does it appear negatively from the bill (in the absence of averment, but there are affirmative allegations to show) that the plan proposed was abandoned and a new one of some kind and not governed by the contract sued on put in its place.    No consolidated corporation was formed, but a new corporation was formed under the general laws. The appellees did not act as agents, giving their services in bringing corporations and individuals together, and get for their compensation what was left of securities after satisfying the constituent members of the consolidation ; for if they did, the overissue would come to them in such a way as to give to the Maryland Brewing Company a claim against them ; but the bill shows that the Maryland Brewing Company has no claim.

JONES, J., delivered the opinion of the Court:

In this case the appellant on the 23rd day of February, 1899, entered into a contract with the appellees, Sperry, Jones & Co., the purpose of which was expressed as follows: "Whereas, the party of the first part (appellant) is the owner of certain brewing property, real, personal and mixed, situate in Baltimore County, and used in connection with the establishment known as George Brehm's Brewery. And, whereas, the party of the first part appreciating the advantage which would be gained if his said business could be consolidated with that of other persons or corporations, so as to make the annual output not less than 560,000 barrels of beer, and reduce the cost of manufacture, is desirous of procuring the assistance of parties of the second part (appellees) in effecting such an agreement." The general undertaking of the said appellees as parties to this contract was expressed as follows : " And the said parties of the second part are willing to undertake the effort to bring about such an agreement, upon the terms herein mentioned, on or before the 1st day of March, 1899." Then follows the stipulation, " that, in consideration of the premises and of the covenants of the party of the first part hereinafter mentioned, the parties of the second part covenant that they will give their best efforts to procure corporations and individuals engaged, in the city of Baltimore or Baltimore County, in the manufacture and sale of beer, ale, porter and similar beverages, hops and malt, to enter into consolidation with each other on or before March 1, 1899, in the manner and on the terms following : "

It is then provided that the consolidated corporation shall be known as the Maryland Brewing Company of Baltimore City; "that the capital stock of the corporation should be $6,500,000.00, one-half thereof to be preferred stock, entitled to receive six per cent cumulative dividends, and the other half common stock ; that the corporation should be formed under the laws of Maryland, and its purpose should be the manufacture and sale of beer, ale, etc.; that it should execute and issue its first mortgage gold bonds of $1,000,00 each,

bearing interest at six per cent, payable semi-annually, the principal to be payable in thirty-nine years from date of bond, to an amount adequate for the purposes to which they were to be applied as provided in the contract, but not to exceed $7,500,000.00; that it should execute to the Citizens' Trust and Deposit Company of Baltimore a mortgage of all the property and franchises it might acquire to secure the payment of these bonds; that this mortgage should provide for a sinking fund as a provision for the ultimate redemption of the bonds and the betterment of the security thereof—the interest coupons of the bonds to be purchased for the sinking fund should be paid as they matured and the moneys paid should be part of the sinking fund; that the issue of stocks and bonds should be used entirely for the purpose of providing the portions to be received by the several constituent corporations and individuals which should enter into the consolidation ("whether said portions be cash, stocks or bonds,") and the purchase of properties to be acquired by purchase and for furnishing working capital, "not less in amount than $500,000.00," and for paying expenses and compensation attendant upon the consolidation and purchase provided for in the contract and for compensation of the parties of the second part; that each constituent member of the consolidated corporation should pass in and deliver to the said corporation all good-will, trade-marks, fixtures, and generally all property, evidences of debt, etc., appertaining to the prosecution by such member of the brewing business, with certain named exceptions; that the consolidated corporation should accept and purchase for cash the malt, hops and raw material so turned in at the invoice prices, and if there should be any ground rents on any of the property passed in and delivered to said corporation, such as could be paid off should be so paid by the grantor, and such as could not be paid off to be capitalized in a manner specified; that the said corporation should assume all existing contracts for materials which the constituent members may have entered into before the 1st of March, 1899; that the said constituent members should have on hand ready

to deliver on said 1st of March, 1899, at least 20 per cent of the average yearly sale of beer as ascertained in a mode specified and should deliver or place at the option of said corporation the said quantity of beer and the said corporation was to pay at the rate of $1.50 per barrel for all excess over the said 20 per cent—provision being further made for any default in having on hand the said 20 per cent; that the issue of capital stock and bonds by the said corporation as provided for in the contract was predicated upon its "starting with the control by means of consolidation and the right of purchase of all the breweries in Baltimore City and Baltimore County, which, according to their sales of beer for twelve months preceding March 1, 1899, have an annual output and sale of beer of 700,000 barrels *per annum*;" the consolidation nevertheless to "take place if so much as an output of 560,000 barrels be produced, and further provided that such consolidation shall embrace" certain "breweries and individuals" that are named and specified; that "in the event that said output shall be less than 700,000 barrels, then a *pro rata* reduction corresponding to the amount less than 700,000 barrels, shall be made at the rate of $20.00 per barrel in the preferred and common stock and bonded indebtedness as aforsaid (said reduction should be made from the capital stock and bonded indebtedness in the relative proportions said stock and bonded indebtedness bear to each other), but before any reduction shall be made there shall be taken from the said shortage in the number of bonds in the annual output of the consolidated companies and individuals below 700,000 barrels capitalized at $20.00 per barrel as aforesaid, all cash working capital and its equivalent as aforesaid;" that the agreement was not to be binding upon the appellant, George Brehm, unless "the breweries, companies and individuals" which had been enumerated should "become a part of the said consolidation;" that each of the constituent members, corporations and individuals, of the consolidation should receive bonds or cash and capital stock in accordance with agreements between them and the said appellees—the agreements to be deposited with the

consolidated company and the stocks and bonds to be issued
to said members as soon as " printed or engraved and issued,"
and the cash to be paid them according to the several agree-
ments—and pending preparation of certificates of stock and
the bonds, temporary certificates to be issued ; and that the
capital stock should be divided among the shareholders on the
stock-books of the consolidated corporation and they become
stockholders in proportion to stocks in said corporation ; that
it was " distinctly understood and agreed and made a condi-
tion " of the agreement that on or about March 1, 1899,
there should be elected nine directors to manage the affairs
of the corporation to be formed for the ensuing year, and
Henry A. Brehm, a son of the appellant, should be elected
as one of the directors ; that the said appellees should furnish
the sum of $500,000 in cash for working capital, and for
the same and for their services in procuring and arranging the
said consolidation, they shall receive all the bonds and stock
aforesaid not necessary for payment and delivery to the several
constituent companies and individuals in accordance with their
several contracts with the said appellees, and the said sum
shall be furnished at the time that bonds and stock so deliv-
ered to the said appellee shall be received by them.   This
stipulation to be strictly in accordance with the terms of the
agreement " as to the amount of stock and bonds to be
issued."

The agreement then sets out stipulations on the part of the
appellant that if the said appellees should succeed on or before
March 1, 1899, in procuring the consolidation and the forma-
tion of a consolidated corporation upon the terms mentioned
in the agreement, "and so that the aggregate output of the
beer of the corporation and individuals entering into the con-
solidation, together with the annual output of beer of " the ap-
pellant "and of other persons and corporations who may
enter into contract with" the said appellees "for sale of their
brewing property, shall amount to such annual output of at
least 560,000 barrels of beer   *   *   *   and embracing the
companies, breweries and parties" which had been enumerated

"and whose entrance into such consolidation" had " been made a condition of the" appellant "entering said consolidation" then the appellant would convey and deliver to the consolidated corporation all his good-will, trade-marks, fixtures, machinery and generally all his property and improvements used in connection with his brewery business, including chattle mortgages, books, accounts, etc., with certain designated exceptions with the stipulation in reference to ground rents upon any of the property, which by previous provisions in the contract was to be exacted of other parties entering the consolidation, that he would "accept as the consideration for said conveyance and delivery the sum of $1,050,000, payable $450,000 cash, $100,000 in bonds, $250,000 in preferred stock and $250,000 in common stock of said consolidated corporation. The said $450,000 to be paid to the appellant when he executed and delivered a deed to the real estate and delivered possession of the other property; that he would have on hand and in readiness to deliver the 20 per cent of his yearly sales of beer under the like conditions and provisions that were prescribed in previous parts of the agreement for other parties entering the consolidation; that he would cause his son, Henry A. Brehm, to enter into the employment of the consolidated company for the period of ten years from March 1, 1899, and his said son to devote his entire time and best attention to the management of the business which had been conducted by him as brewer and manager for the appellant, at the yearly salary of $12,000—the supplemental agreement as to this employment being referred to and made a part of the agreement; that upon making conveyance of his property as aforesaid, he would not directly nor indirectly, nor as agent, etc., within the period of ten years from March 1, 1899, engage in the business relinquished by him, except for the consolidated company; and lastly, that the agreement between the parties should be assigned to the consolidated corporation when formed to be enforceable by and to bind the said corporation and its obligation to be in substitution for that of the said appellees.

On the same day that the recited agreement was made the same parties united with Henry A. Brehm in a "supplemental agreement" which, after referring to the principal agreement and the stipulation therein by the appellant "to sell and convey and assign" to the said appellees "and a corporation to be formed as therein fully mentioned, certain good-will" and other specified property appertaining to appellant's business indicates its purpose as follows, "and whereas said agreement refers to a supplemental agreement in which said property, etc., to be conveyed, assigned, and sold is to be more fully set out and described, therefore this agreement is entered into for said purpose. And whereas the said agreement of the 23rd of February, 1899, contains a provision that Heny A. Brehm shall enter into the employment of the said consolidated corporation from the 1st day of March, 1899, as to be provided in a supplemental agreement, therefore this agreement is made to fully set forth said terms of employment." It then mentions and describes the property to be conveyed, etc., and refers to a schedule of real estate annexed thereto which is to be taken as indicating the only real estate intended to be "included in or in any manner affected by said agreement;" after which there is a provision that Henry A. Brehm agrees "to enter the employment of said consolidated company for the period of ten years," etc., at the yearly salary of $12,000 and that the said company agrees to employ him, etc., which provision concludes as follows : "And it is understood that the said employment of the said Henry A. Brehm for ten years at the salary of $12,000 per year, is a condition precedent to the conveyance of any of said property mentioned in said agreement, and in case the said Henry A. Brehm is not employed at said salary and for said term by said consolidated company, then the said agreement above mentioned and this agreement and all other agreements heretofore made relative to said sale or transfer of said property mentioned in said agreements between these parties shall be considered as utterly at an end."

On the 5th of April, 1900, the appellant filed in the Circuit

Court of Baltimore City his bill of complaint in this case, in which, after summarizing and setting out in substance the provisions and stipulations of the said agreement, it is alleged "that the said Maryland Brewing Company was duly incorporated under the laws of Maryland." The plaintiff's (appellant's) construction of the agreement is then stated to be that in consideration of the conveyance by him to the consolidated corporation, provided for in the agreement of his property, etc., used by him in his brewing business, "he should be paid four hundred and fifty thousand dollars in cash and one hundred thousand dollars in stock, common and preferred," of the new corporation. "And that to fix and ascertain the value of the said stock and bonds (and thus to give certainty and exactness to the value of the consideration to be received by him for his said brewing property), the total issue of said stock and bonds should be dependent upon the annual output in barrels of beer of the constituent breweries of the "corporation to be formed under the agreement." "And that the compensation of Sperry, Jones & Co. (appellees), for their services in bringing about the union of the several breweries should be only the amount of stock and bonds of the Maryland Brewing Company (issued as aforesaid on the basis of the annual output in barrels of beer of the constituent breweries), left after fulfilling and satisfying the contracts for the several breweries." Therefore if there was issued by the new consolidated corporation stocks and bonds in excess of what was proper when calculated upon the basis indicated this "would *pro tanto* wrongfully decrease the real consideration to be paid" to the appellant for his property "and at the same time wrongfully and improperly increase the compensation to be paid to Sperry, Jones & Co. (appellees), for their services," etc. In this connection it is alleged that the appellant "parted with his brewery property in the belief that the contract between Sperry, Jones & Co. (appellees), and himself in regard to the amount of the stock, common and preferred, and of the bonds of the Maryland Brewing Company to be issued by said company, and the relation of that amount to the annual barrelage of the

constituent breweries would be fully and faithfully complied with."

The bill then alleges a violation of the agreement as thus construed, in this, that the Maryland Brewing Company, the corporation formed under the agreement from the union or consolidation of the various brewery companies and individuals that entered into the scheme of consolidation outlined and provided for therein, issued outstanding securities to the amount of "twelve million eight hundred and three thousand dollars. Of these seven million three hundred and three thousand dollars were in bonds; two million seven hundred and seventy-five thousand dollars in preferred stock and a further sum of two million seven hundred and seventy-five thousand dollars in common stock." And that this issue of bonds and stock was in excess of what was authorized under the appellant's agreement with Sperry, Jones & Co. (appellees), upon the basis that was to regulate such issue because instead of their being an annual output of 700,000 barrels of beer of the breweries that formed and became amalgamated with the Maryland Brewing Company, the total annual output of beer by these only amounted to about five hundred and seventy-five thousand barrels of beer *per annum.*

This would make, it is alleged, the total capitalization of the Maryland Brewing Company authorized by the agreement between the appellant and Sperry, Jones & Co. (appellees), eleven million five hundred thousand dollars, to be divided into six million one hundred and seventy-five thousand dollars bonds, two million six hundred and sixty-two thousand five hundred dollars common stock, and two million six hundred and sixty-two thousand five hundred dollars preferred stock, making an overissue of one million one hundred and twenty-eight thousand dollars in bonds, and of eighty-seven thousand five hundred dollars in preferred, and of a like sum in common stock of the said corporation. From this it would result, it is alleged, that the stock and bonds of the said corporation, received by the appellant as a part payment of the purchase price of his brewing property, were rendered *pro tanto* less valuable than

was contemplated and agreed upon between him and the said appellees. It is further alleged that not only has there been "a grossly excessive issue of bonds, preferred stock and common stock" as charged; but that there has also been a gross and improper overissue of bonds *pro rata* to the stock, common and preferred." The bill also alleges that the contract in controversy has never been assigned to the Maryland Brewing Company, but as to this no relief is asked as will be presently seen.

The prayer for relief therein is that the appellants, Sperry, Jones & Co., may be required to "deliver up to the Maryland Brewing Company $1,128,000.00 par value of the first mortgage bonds of the Maryland Brewing Company $62,500.00 par value of the common stock of the said Maryland Brewing Company, and $62,500.00 par value of the preferred stock of the said Maryland Brewing Company; or, if they have not enough of said bonds and stock in their possession to comply with said requirement, that for so many mortgage bonds and for so much of said stock, preferred and common, as they fail or are unable to deliver to the said Maryland Brewing Company, that they pay to said Maryland Brewing Company either the par value of said bonds and stocks so as aforesaid undelivered, or the highest market price attained by said bond and stocks from the issue of the same to the date of the decree herein as may be most advantageous" to the appellant; and that the Maryland Brewing Company of Baltimore City may be ordered to receive the above-mentioned stocks and bonds for cancellation, retirement or use as an asset of said company. As ancillary to this relief there is also a prayer for an injunction and receiver. To this bill there was a demurrer which the lower Court sustained and then passed a decree dismissing the bill.

It is not clearly perceived to what head of equity jurisdiction the case presented here is to be referred. The bill is not filed as in the nature of one to enforce a trust by the appellant as a stockholder or member of the corporation formed as herein set out; but is essentially one to enforce independent

individual contractual rights of his own growing out of a contract that antedated the corporation. It is true that it is alleged that the suit is brought as well for the benefit and advantage of all the corporations and individuals (owners of brewery property) which were constituents of the said corporation similarly situated as he was towards Sperry, Jones & Co., but the contract, which it is the object of the bill to have enforced, was made with the appellant individually and not for or on behalf of any others, and no rights are attempted or designed according to its plain import to be secured thereby to others than the immediate contracting parties. It is not perceived, therefore, how, in a suit on this contract and to enforce rights therunder, there can be others not parties to it who can have any such community of interest with the appellant as to become participants with him in this suit. The suit is therefore essentially the individual suit of the appellant and must be so treated.

The ground of complaint is that the consideration upon which he parted with his property described in this bill and in the contract, though, upon its face being the same that the contract provided for, is rendered less valuable to him by reason of what he asserts was a departure, by the parties with whom he contracted, from their obligation imposed by a certain stipulation therein. The suit is brought to enforce and make effective that stipulation, and it has been suggested in argument that the bill is in the nature of a bill for a specific performance and it has been so treated throughout. It will be treated in that aspect here.

It is a proposition too familiar to need repetition that a decree for relief upon an application for specific performance is not a matter *ex debito justitiæ*, but the application is addressed to the sound discretion of the Court to be granted or refused "upon consideration of all the circumstances of each particular case." *Semmes* v. *Worthington et al.*, 38 Md. 298. See *Miller Eq. Proc.*, p. 763, see 656 and cases there cited. In *Fry on Spec. Perform.* sec. 44, it is said: "The meaning of this proposition is not that the Court may arbitrarily or capri-

ciously perform one contract and refuse to perform another; but that the Court has regard to the conduct of the plaintiff and to circumstances outside of the contract itself, and that the mere fact of the existence of a valid contract is not conclusive in the plaintiff's favor." Again it is said: "A party cannot call upon a Court of equity for a specific performance unless he has shown himself ready, desirous, prompt and eager," and that specific performance is a relief which a Court of equity "will not give unless in cases where the parties seeking it come promptly, and as soon as the nature of the case will permit."

The question before the Court here arises upon a demurrer to the bill, and we are to look to the bill to see if, according to the principles stated as governing Courts of equity in cases of this nature, the showing made by the bill of complaint here is such as to entitle the appellant to the aid of the Court. The contract in question is not, in its entirety, such a one as the appellant could have had specific performance of upon an application for that form of relief. It is not a *mere* contract of sale on one side and purchase on the other, certain and definite in its terms. It is not a contract to do any certain and definite thing at all events by either party to it. On the part of Sperry, Jones & Co. it is simply a contract "to give their best efforts" to bring about the consummation of a scheme outlined therein. If they used their best efforts to put the scheme into operation it is all they could be called upon to do; and a failure to succeed in carrying out the contract or any particular stipulation in it in spite of their best efforts would have given the appellant no cause of action against them of any kind.

On the other hand he was under no obligation to do any of the things agreed to on his part unless they succeeded in their efforts. Obviously, therefore, the contract was not of a nature to be specifically enforced in its entirety against the other parties to it on the application of the appellant. Then if he could not specifically enforce the entire contract it would seem illogical that he could so enforce a part of it or a particular stipu-

lation of it; at least unless under some special circumstances shown to move the Court and where would be the necessity of propriety of according him such a remedy under the circumstances of this case as they have been detailed.

The suit here rests upon the fact of the general scheme provided for in the contract having gone into operation and the appellant could only have become connected with it in obedience to the obligation of his contract or by his own consent irrespective of the contract. He had the option, when Sperry, Jones & Co. presented to him the result of their efforts in consummating or perfecting the scheme outlined and provided for in their contract with him, either to reject or adopt what they presented to him, if it, in any respect, did not accord with the stipulations and provisions of the contract. It was only in the event of these stipulations and provisions having been, each and all, complied with that he was bound to observe the stipulations which the contract contained on his part. If, therefore, he accepted from Sperry, Jones & Co. what they had done as a consummation and a carrying out of the scheme which it was the design of the contract to perfect and put in operation, this must have been so accepted, as far as the bill shows, either because what they had done was recognized by him as a compliance with the contract or because, though not in compliance therewith, he chose to waive such compliance and accept what was presented.

If, then, he became connected with the scheme under his contract when the same had not been performed according to its stipulations by the other side, why did he do so while the contract was unperformed? If he answers, he did not know it was unperformed, why did he not know it? Ought this not to be explained to the Court? The bill nowhere shows that he was prevented by any body or by any circumstances, that would go to excuse a want of care on his part, from knowing at the time he passed over his property to the new corporation created in persuance of the plan prescribed or outlined in the contract in question whether or not the stipulations therein contained had been observed by the other parties to it. If,

therefore, he did not know this, he might have known it, as far as appears. Ignorance in this regard could only have been due to the want of that diligence and caution on his part which the Court may rightfully require him to show before extending its aid in an application of this nature. It is alleged in the bill of the appellant that he parted with his property in the belief that the provisions of the contract between himself and Sperry, Jones & Co., of the violation of which he now complains, would be fully and faithfully complied with. This, however, is far from saying that there was anything that prevented him, with the exercise of diligence on his part, from knowing at that time that these provisions had not been complied with, if such was the fact.

In this connection there is this further fact that the bill in this case was not filed for more than a year after the time fixed in the contract in controversy here for the completion and putting into operation of the scheme for a consolidated corporation therein provided for; and when under the contract the appellant was called upon to pass over and transfer his property to the new corporation. And notwithstanding the suit was intended to affect securities liable to fluctuations in value and changes of ownership within that time no explanation is given of this delay which, under the circumstances of this case, and in the absence such explanation is, we think, to be imputed to the appellant as laches, a defense of which the defendants (appellees), can avail under the demurrer, *Noble* v. *Turner*, 69 Md. 520. It is not unreasonable to exact of the appellant this measure of vigilance in regard to his rights under the agreement in question when he is asking the aid of the equity to enforce a minor provision thereof while he is enjoying the benefit of the main provision.

The main purposes and objects of the agreement have been effected, as it would seem, from the allegations of the bill and the inferences these afford, and the appellant is and has been from the time fixed for putting into operation the scheme outlined therein in the enjoyment of the benefits accruing therefrom. The purpose of the agreement was not the mere sale

of the property owned by the appellant nor was the price to be obtained by such sale the inducement for entering into it. The passing over of the property by him to the consolidated corporation was part of a general plan the object of which was, as stated in the principal agreement, "the advantage which would be gained" if his brewery business "could be consolidated with that of other persons or corporations so as to make the annual output not less than 560,000 barrels of beer;" and in carrying out this plan another object, as stated in the supplemental agreement, was to secure to his son employment by the new corporation to be formed for ten years at $12,000 per year; this last object being deemed of sufficient importance to be made "a condition precedent to the conveyance" by the appellant of any property mentioned in the agreement; and to have it provided that if his said son was not employed at said salary and for said term by said consolidated company then both the principal and supplemental agreements, and all other agreements "made relative to the sale or transfer" of the "property mentioned in said agreement" between the parties thereto should "be considered as utterly at an end." Now, as we have seen, if not so expressly stated in the appellant's bill, it is to be inferred therefrom (since the appellant's case rests on this), that the contract in question has been performed by the other parties to it in all of its features and provisions, other than those made the subject of this controversy, and that the appellant is in the enjoyment of the benefits accruing therefrom according to its main intent and purpose, that is to say he has accepted all of the things done under the contract that were advantageous to him.

It can only be fair and reasonable that the appellant should be required to be prompt and diligent in bringing to the notice of these parties when accepting from them the results of their labor and securing the benefits mainly contemplated by him in entering into the contract with them, any question that was to be made as to the construction of the contract in regard to their rights or as to how they had performed their part of it, and failing in this be deemed to have waived any such ques-

tion so far at least to disentitle him to the particular relief sought, to wit, an exact performance of the contract.

These considerations are such, as to say the least, not to commend the appellant's application to the favor of the Court. They are not the only reasons, however, making against the granting of the appellant's application for specific relief. The application is not to have enforced a provision appearing in the contract in certain and definite terms indicating the exact relief to be decreed in regard to it; but it is to have enforced the appellant's construction of certain provisions therein; and it is not made clear just what is to fix and determine the terms of a decree, as shown by the fact that there has been developed in the course of the proceeding much and reasonable difference of views as to the results of that construction.

Again, the bill does not allege that the appellant was at the time of bringing suit possessed of any of the securities which he alleges to have been injuriously affected by the matters complained of and unless he is now holding these the specific relief prayed would be of no avail or benefit to him. The appellant has sought to meet this objection to his bill by saying that, it appearing that he came into possession of the securities under the contract between himself and the other parties to it, the inference is that such possession continues until the contrary is shown. We do not think the principle there invoked has any proper application here, but, be this as it may, essential facts ought to be made to appear in pleading by direct averment and not by inference.

For the foregoing reasons the Court below properly sustained the demurrer to the appellant's bill which showed no such equity as to make proper grounds for a character of relief that would, as stated by that Court, prove very oppressive to the defendants, who were parties to the contract sought to be enforced and would enure for the most part to the benefit of parties, other than the appellant, who are not shown to be entitled to any such relief and who are certainly not asking it.

As to the suggestion that the Court can, although refusing the specific relief prayed, decree other and different relief, no

other kind of relief has been suggested except that the Court decree compensation to the plaintiff for the loss he alleges he has sustained ; and as to this we need only say that by whatever standard this loss is to be measured we can see no more difficulty in arriving at the damages to be allowed by proof before a jury than in proceedings before an auditor.

As the appellant's applications is not refused on the "mere" ground that he has an adequate remedy at law it is not necessary to have any reference in disposing of this case to Art. 16, sec. 199 of the Code.   Nor do we see any necessity under the circumstances here to treat of the power of the Court below under Art. 26, sec. 42 of the Code, as enacted by Act. 1896, ch. 229, nor of the power of this Court to review the exercise of it.

Since the argument of this case we have been referred to the case of *Gluckstein* v. *Barnes*, L. R. Appeal Cases, 1900, part 3 (issue of June 1, 1900), p. 240–259, as having an important bearing on the case at bar and tending to support the contention of the appellant.   An examination of that case makes obvious the broad distinction between it and the case here. The jurisdiction of the Court was invoked in that case upon the ground of fraud and to enforce and protect a trust.   The whole argument, both at the bar and in the opinions delivered by the judges, was directed to show : 1st, the fiduciary relation between the party sued and the fund which it was sought to have restored, and the parties interested in it; 2nd, the abuse of the trust by the party sued.   These two propositions being established, nothing could be clearer than that a Court of equity had jurisdiction to afford relief.   The suit was instituted by the official receiver and official liquidator of a company that had gone into liquidation.   The funds in controversy were sought to be recovered for the benefit of the shareholders of the company who had subscribed to the funds of the company upon misrepresentations made by the defendant in the case in connection with others; these shareholders not knowing and having no opportunity to discover the falsity of the representations made.   The defendant in the suit had with

others appropriated the funds sought to be recovered to the payment to himself, and these others of profits in the purchase of property which the Court found had been taken and held by them impressed with a trust, and had concealed from the shareholders, whose subscriptions they had invited and whose money they had used in such payment, the fact that these profits were to be so paid.    These parties had bought the property nominally at one price, but in reality at a much lower one. They had then proceeded to form a company of which they were trustees or directors and issued a prospectus inviting subscriptions.    In this they represented that the property had been bought at the price at which it was nominally purchased and that it would be sold to the company at a price named, thus ostensibly disclosing the profits they were to make in the transaction.    Out of the funds subscribed they paid themselves, in addition to these apparent profits, the difference between the nominal and the actual cost of the property to them. In this transaction the subscribers to the funds had no other relation thereto, nor to the parties in control of them than as shareholders in the company.    In the case at bar the relations of the parties are established and fixed by contract, in which the rights and obligations of the respective parties are set out and carefully defined.    Each party had the right to know, and as far as appears, the opportunity to see that their respective rights were accorded them in the consummation of the transaction that was the subject of the contract.    The suit is by one of the parties to the contract against the other party, and the basis of the suit an alleged breach of one of it's provisions as it is construed by the party suing.    The dissimilarity between this case and the case which has been just referred to could hardly be more marked.    The decree of the Court below will be affirmed.

> *Decree affirmed with the costs to the*
> *appellees.*

(Decided January 17, 1901.)