JOHN A. TOMPKINS ET AL., RECEIVERS OF THE MD.
. BREWING CO. *vs.* SPERRY, JONES & CO. ET· AL.

*Promoters of Corporations—Alleged Overissue of Corporate Securities—
Bill by Receivers of a Corporation to Recover Profits From Pro-
moters—Rights of Subsequent Purchasers of Stock and Bonds—
Waiver of Notice of Meeting.*

When the owners of property form a corporation to which the property is
transferred and these persons are the only shareholders in the company,
taking the shares in payment for their property, then if subsequent
purchasers of the shares are deceived by false representations as to
value, their remedy is a claim for the damages suffered by each individ-
ually, but neither the corporation itself nor its receiver has a·corporate
right of action against the original shareholders.

Code, Art. 23, sec. 61, provides that subscriptions to the capital stock of
a corporation shall not be settled for in property unless authorized by
the stockholders in general meeting pursuant to a call. *Held,* that if
all the stockholders are present at a meeting which authorizes property
to be received for a subscription to stock, no previous notice is neces-
sary.

A bill by the receivers of an insolvent corporation against the persons who
had promoted and formed it alleged that these defendants contracted
with certain named brewers, who agreed to transfer their establish-
ments to the company and accept in payment therefor money and the
securities of the company at a valuation based upon their respective
output of barrels of beer in the preceding year and that the total capi-
talization of the company in stock and bonds should be fixed in pro-
portion to the total barrelage, as evidenced by certain contracts with
brewers filed as exhibits with the bill ; that in making these contracts
the defendants stood in a fiduciary relation to the company and were
not entitled to make a secret profit out of the transaction ; that the de-
fendants, having control of the company, caused it to issue a large
number of bonds and shares of stock in excess of the amount that
should have been issued according to the proper estimate of the output
of the constituent breweries, of which the defendants received the bene-
fit. , The bill charged that this overissue of securities procured by the
defendants and the sale of the same with the aid of certain trust com-
panies ( co-defendants) was a fraud upon the company and its original
stockholders and the bill prayed for an accounting of the proceeds of
the bonds and stock so obtained. Although the bill alleged that all
the contracts made with the brewers entering into the consolidation
were similar to the contracts with A and B copies of which were filed

as exhibits, yet these two contracts were different in character. A's contract provided that he would sell his brewery to the corporation when formed for a certain price in cash and in securities, provided the annual output of the combined establishments should not be less than a designated number of barrels and provided also certain enumerated breweries became part of the consolidation. But another exhibit with the bill showed that A's brewery was not acquired by the company from him, but from the defendants directly and at a less price than that named in the original contract, and that the provisos contained therein had prevented it from becoming operative because they had never been complied with. The other contract with B provided for a sale outright of his brewery to the defendants and the company took over this brewery from them at the same price. At the meeting of the company which authorized the issue of stock and bonds as actually made, all of the stockholders were present and there was no concealment as to the exact amount of cash and securities received by each brewer and the amount of securities authorized to be issued. *Held*, upon demurrer,

1st. That the bill does not state a case entitling the receivers to demand an accounting on behalf of the company for an improper issue of securities since there is no allegation of concealment or misrepresentation to the persons to whom the stock and bonds were issued ; that the defendants did not occupy a fiduciary relation to the company when they made the contracts with the brewers, because defendants then owned all of the stock of the corporation ; that if these contracts called for delivery to the respective brewers of bonds and stock of the company capitalized upon a certain basis, and such securities were issued upon a different basis of capitalization, that might afford to each brewer a right of action against the defendants for such damages as he suffered under the terms of his particular contract, but these various contract rights of the different brewers cannot be asserted collectively in this suit by the receivers.

2nd. That when the defendants sold the bonds and stock to other parties they were bound to make no concealment of material facts, but this was an obligation to each purchaser, and in case of a breach of this duty, the rights of the purchasers are several and distinct according to the nature of the transaction and cannot be collectively enforced in this suit by the receivers.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John Prentiss Poe* and *Henry W. Williams* (with whom were *N. Winslow Williams* and *Wm. S. Thomas* on the brief ), for the appellants.

In this case the promoters obtained options upon various

properties for the benefit of the corporation, it being the basis of all said options and agreements that the value of said properties to the said corporation, with an added cash capital of $500,000 was at the rate of $20 per barrel of annual output, and that, such properties should be turned into said corporation at said rate.

The promoters under these circumstances, were under obligations. (1) To select an independent board of directors and thereupon submit these various propositions and options to said board of directors for its approval or disapproval. (2) They were obliged to disclose to said independent board of directors the profits they, the said promoters, expected to make from such transaction. (3) If it was desired to modify said contracts, then it was the duty of the said promoters to suggest proper modifications thereof to the said corporation. But Sperry, Jones & Co. absolutely failed in each and every one of these duties to this corporation and its future security holders. "As promoters are bound to act fairly and with good faith in availing themselves of the powers and opportunities accorded to them by the law authorizing the creation of corporations, it follows as a rule that in organizing, or in procuring, through others under their control, the organization of a corporation to purchase or take a lease of their own property in which they have an interest, or to enter into a contract in which they are interested, it is their duty, as far as they have the power and opportunity, to see that a competent and disinterested board of directors is chosen, in order that the corporation may have proper protection when it comes to a determination of the question whether or not it is expedient for it to enter into the proposed transaction. And it is their duty not only to provide a board of directors who can exercise an independent and intelligent judgment on the transaction, but to see that they do exercise such judgment ;" *Alger, Law of Promoters,* sec. 24; *Erlanger* v. *New Sombrero Co.,* L. R. 3 App. Cas. 1218.

In the case at bar we have the promoters acting in a fiduciary capacity, transferring to the corporation in which they

are trustees, certain properties upon which they have contracts of purchase for the benefit of the corporation, at a valuation fraudulently in excess not only of the real value of the properties themselves, but fraudulently in excess of the valuation which was agreed upon by all the parties thereto that they should be transferred to such corporation, and all this through a dummy board of directors and stockholders and for their own secret profit and emolument. Certainly they can be called to account in equity for such over issue of securities, by the receivers of the corporation ruined by such wrongful acts. *Gluckstein* v. *Barnes,* L. R. (1900) Ap. Cas. 245; *Yale Gas Stove Co.* v. *Wilcox,* 25 L. R. A. 90.

In *Hayward* v. *Leeson,* 12 A. & E. Corp. Cas. 528, certain promoters undertook to turn over to the corporation in question, certain properties secured by them, at a profit of $700,000 in stock, and the Court found as a matter of fact, that the said promoters' valuation was made in good faith and that the said promoters did as a matter of fact, obtain the consent of all the stockholders of the then existing corporation to such transaction; but it further appeared that at such time all such stockholders were under the control of the promoters themselves, and the Court says: "But even if they did so believe and their belief was honest, and there was a foundation for that honest belief, they none the less were guilty of fraud. It is a fraud for promoters to undertake to decide for the future stockholders in the corporation to be organized that one-third of the whole capital stock of that corporation is a fair remuneration for their services as promoters, to issue one-third of the capital stock to themselves as such remuneration, and then to invite the public to subscribe to the stock of the corporation, without disclosing that fact to the subscribers, and without getting their consent to the payment of that remuneration."

These cases illustrate the doctrine that the promoters of a corporation are in the position of trustees for its future stockholders, and bondholders, and as such trustees they must give such future stockholders and bondholders through the

corporation, the full benefit of any contracts they may have entered into or properties they may have acquired in their capacity as such promoters, and they cannot even make any legitimate profit therefrom unless they submit the entire transaction to the fair judgment of an independent board of directors.

When Sperry, Jones & Co. caused this corporation to overissue a large amount of securities contrary to such agreements, they committed a fraud not only against Brehm who may have had knowledge thereof, but also against every stockholder of the United Breweries of Baltimore City who by no possibility could have had such knowledge. or could have given his assent thereto, every one of whom was at that time a future stockholder in the Maryland Brewing Co.

Further, $4,000,000 in bonds of this company, were sold on the open market by the defendants, the Mercantile and Citizens' Trust & Deposit Companies, to the public at above par, on the strength of a circular which specifically represented that the capitalization was $13,300,000 based upon an annual output of 665,000 barrels, being at the rate of $20 per barrel, as agreed by the promoters. The takers of these bonds, therefore, were not only defrauded through the fraud committed upon the corporation, but were directly defrauded by the misrepresentations of the promoters themselves.

However, it hardly seems necessary to discuss at length the situation of the stockholders and creditors of this company for the reason that the corporation itself was defrauded and has itself a right to maintain this action. for an accounting against the promoters or trustees for the illicit profits obtained by them. The corporation was defrauded in that the promoters through a dummy board of directors imposed upon it the serious burden of various contracts entered into by the promoters as its agent for its benefit, while at the same time the said promoters deprived said corporation of the advantage thereof ; and being so defrauded, the receivers of said corporation now that it has escaped from the control of said promoters, have an absolute right in a Court of equity to call

them to account for all the securities of the corporation which they took from its treasury without right or warrant. *Hooper v. Central Trust Co.*, 81 Md. 559; *Central Trust Co.* v. *Arctic Ice Machine Co.*, 77 Md. 202.

The gross overissue of $1,680,000 of bonds was made, handled, sold and the benefits received by the promoters of the corporate scheme. These promoters were the appellees. They had knowledge of all the facts. In colors glowing enough and in misrepresentations strong enough for an action of deceit, they put these bonds on the market at a large profit and in two years the corporation was a miserable wreck and the properties which the promoters palmed off on the corporation at the price of thirteen millions of dollars were found to be worth only three millions five hundred thousand dollars.

These allegations——these facts stand confessed. Upon all the authorities, as has already been abundantly shown, promoters of such corporate inflations as the *"dismal failure"* we have before us, whose *"excessive over-capitalization"* was the chief cause of its early collapse, stand in a *fiduciary relation* to the corporation, which like a bubble they blow into existence, and before they can be permitted to put over on it at a profit, properties belonging to themselves or controlled by themselves, they must clearly, show that the corporation by free, capable and independent action of a real and responsible governing body did intelligently decide to take the property and that the price was a fair and reasonable price. Where the admitted facts show, as they do here, that the governing body was wholly composed of the pliant tools and dependents of the promoters and that they met only to go through the empty form of adopting a resolution presented to them by the promoters whom they blindly and servilely obeyed without inquiry, deliberation, investigation or any concern whatever for the corporation which was thus started into life with a burden impossible to be borne, there ought to be no doubt that the defendants are liable for the abuse of trust.

*Edgar H. Gans* (with whom was *B. H. Haman* on the brief), for Sperry, Jones & Co., appellees.

The demurrer sets forth that: 1. The bill is multifarious. 2. The bill is inconsistent with itself, the case stated in each part thereof being repugnant to the case stated in another part, and is therefore unintelligible as to the case intended to be stated. 3. There is no case entitling them to any relief in equity. 4. There was laches in filing the bill. 5. And for other reasons the bill is bad.

The cause of action thus attempted to be stated *rests upon contract*—the contract of Brehm and other alleged similar contracts. The alleged overissue is an overissue because the corporation was under obligation to Brehm and the others, *by contracts*, not to issue bonds and stock beyond a certain amount. Surely when such a cause of action is attempted to be stated it is essential to allege that the conditions were performed upon which alone the contractual obligations arise. This contract was between Brehm and Sperry, Jones & Co., and in it was a provision that when the consolidation scheme was successfully brought about by securing other contracts from certain designated brewers, all agreeing to the consolidation scheme in detail set forth, then these contracts were to be assigned by Sperry, Jones & Co. to the Maryland Brewing Co., which was to succeed to the rights and obligations therein created.

The alleged contractual obligation upon which the appellants rely depends absolutely upon the performance of a certain condition, and nowhere in the bill is there any allegation that this condition was in fact performed. On the contrary, it is obvious from the bill and exhibits that no consolidation of any kind was formed or attempted, but that the property of the Maryland Brewing Company was acquired by purchase from Sperry, Jones & Co., who had acquired the title thereto and sold it to the company on terms expressly agreed to between them and the company. *Brehm* v. *Sperry, Jones & Co., 92 Md. 378.*

But after their abortive attempt to state a cause of action

founded on the Brehm or similar contracts, the appellants then absolutely shift their ground and show that the property of the corporation was not acquired by attempting in any way to form a consolidation, or in supposed furtherance or performance of any such contracts ; but that the corporation acquired its property by purchase from Sperry, Jones & Co. under an express and definite contract.

Paragraph 6 and Exhibit C show that not only was no consolidation attempted along the lines of the Brehm contracts, but that the corporation purchased direct from Sperry, Jones & Co. the properties it acquired, and issued to them all its bonds and stocks in consideration therefor, except the 100 shares originally subscribed for.   So it appears that the very bonds and stocks upon the ownership of which the appellants are basing this litigation are bonds and stocks whose title is traced through Sperry, Jones & Co., who received the same as the consideration for their sale of properties to the company.

It became necessary, therefore, to state a new ground of relief, and accordingly the bill states, (*a*) that the bonds and stocks were void because the proposition of Sperry, Jones & Co. was not acted on at a meeting pursuant to a call to consider the propriety of receiving the same ; (*b*) that the vendors and vendee were practically the same people ; (*c*) that the issue of stocks and bonds was a fraudulent overissue, because the property received therefor was worth less than 50 per cent of the par value of the securities, and (*d*) because Sperry, Jones & Co. had already contracted to purchase the properties for the company at prices much less than the amounts contained in the proposition of February 15th, 1899.

Now, here is certainly a variety of alleged causes of action. Whatever may be thought of them individually considered it is perfectly clear that each and all of them are entirely different from the cause of complaint, founded upon the Brehm and similar contracts also set forth in the bill.   The alleged cause of action founded upon the Brehm contract consisted in the alleged overissue of securities, overissued because it was alleged that by such contracts only a definite amount of securities could be

issued, and in violation thereof a larger amount was issued. The complaints now made are not· founded at all upon the working out of the consolidation under contracts similar to the Brehm agreement, or the overissuance of securities by virtue of their being contrary to these agreements, but upon certain alleged illegalities and·frauds connected with the issue of securities for property sold to the corporation.   It is quite clear, therefore, that the point we have thus far been discussing is entirely made out, towit, that the bill is inconsistent with itself and unintelligible as to the case intended to be stated.

·There is nothing in the declaration that the .vendors and vendees were practically the same people.   It is a common every day practice for a man or a set of men having property to turn it into a corporation, which they control by owning the stock, or by being directors of the corporation.   There are, it is true, certain obligations resting upon them in this situation, but no case has ever held that such an arrangement is void.   Nor can there be anything in the suggestion that there was an over issue of stock or bonds upon theory that the property received was of much less value than the par value of the securites, even if this were true as a matter of fact.  The alleged over-valuation of property and the issuance of securities therefor frequently has been made the subject of litigation in Courts of equity, but the only cases in which these questions are considered are cases where it is attempted to subject persons, who receive stock from such over-valued property, to·the liability of subsequent creditors, who become such upon the faith of the capitalization apparent from the issuance of the stock.   But we have already seen that this is not a bill to collect·alleged· unpaid subscriptions of stock, and if it were, the bill is multifarious.   This allegation, therefore, has no place in the bill at all.

Out of all of this confused and contradictory matter, the solicitors for the appellants in the lower Court below, forgetting the exact allegations of the bill, undertook to found their relief upon a series of cases fixing the liability of promoters for secret profits, and they quoted the leading cases on this sub-

ject in England and the United States, and endeavored in a loose way to apply the reasoning of those cases to the case thus confusedly stated in the bill, and the discussion would not be complete without some reference to the principles established by the Courts of England and the United States as to the liability of promoters for secret profits. *Erlanger* v. *New Sombrero Co.*, L. R. 3 App. Cas. 1218; *Gluckstein* v. *Barnes*, (1900) App. Cas. 240.

The principle which underlies these cases is about this : If a man or set of men, purchase property with the intention of turning it over to a corporation formed by them ; if they form the corporation and by the original subscription to a few shares of the stock become for the time being the corporation, electing directors controlled by them ; if, in this situation, they have their dummy directors, agree to take from them property which they have bought at large price ; and if, after that is done, they issue a prospectus inviting subscription to stock from the community, and in that prospectus to make false representations, either positive or negative by a *suppressio veri*, as for example, suppressing the price at which they originally bought the property, then a Court of equity regards them from the beginning as acting in a fiduciary relation to the prospective stockholders, and will not allow them to make a profit by their transaction, except with the consent of these prospective stockholders.

This, in brief, is the theory of these cases. For example, in the *Erlanger case*, a syndicate, headed by Erlanger, who was a Paris banker, purchased a crown lease on the Island of Sombrero in the West Indies, for 55,000 pounds, and turned it into a corporation, originated and controlled by them for 110,000 pounds. As soon as the contract was made with the formal corporation, a prospectus was issued inviting the public to subscribe for shares, but this prospectus concealed the fact that they had paid only 55,000 pounds for the property.

In the *Gluckstein* v. *Barnes case*, a syndicate was formed to buy a place of entertainment in London, called the "Olympia," and to re-sell to a company in which they would be directors.

They bought up charges on the property for a sum below the amount which the charges afterwards realized, and thereby made a profit for the syndicate of 20,000 pounds. They bought the property for 140,000 pounds, formed a limited company, and re-sold the property for 180,000 pounds to the company, of which they were the only directors. They issued a prospectus inviting application for shares and disclosed the price at which they bought the property, but concealed the fact of their profit of 20,000 pounds on the purchase of the charges on the property. In both of these cases the Court very properly held that these profits made by the promoters should be given up. It will be observed, however, that these are cases where the property is sold to a corporation when it is controlled by the vendors, but in addition thereto, where the real corporation is to consist of the public, who will come in and subscribe to shares on a prospectus. It is the money thus subscribed by the public on the face of the prospectus that pays for the property. The promoters, therefore, must necessarily be regarded as the agents for these innocent subscribers, whose money pays for the property, and they will be held to the liabilities of the unfaithful fiduciary towards these people.

Now, it was attempted in the Court below by counsel for the appellants, to assimilate the case attempted to be stated in this bill to these cases in the House of Lords, and similar cases in the United States, but manifestly they had no application. This is not a case where property was purchased by Sperry, Jones & Co., at one price, then turned into a corporation, controlled by them, by having dummy directors, and then having a prospectus issued whereby shareholders come in as original subscribers of stock and whose money pays for the property. There is not a semblance of such a case stated by the bill. The case stated by the bill even conceding, for the purposes of a demurrer only, the truth of the allegations, is a case where Sperry, Jones & Co., sold to a corporation controlled by them, as alleged in the bill, all the property which the corporation acquired, and received from the corpo-

ration in consideration thereof all the bonds and all the stock which was issued by the corporation. The public did not come in by virtue of being original subscribers. No one who now has, or ever has had any stock or bonds in the Maryland Brewing Company, holds such stock and bonds, except through Sperry, Jones & Co. They did not deal with the corporation. They were not invited to come into the corporation by original subscription. The only possible relation that any part of the public, now holding bonds and stock, was the relation of purchase, either immediate or intermediate, from Sperry, Jones & Co., for the securities issued for the original transfer of the property. This being the case, it is very evident that the cases already referred to, and numerous American cases of like character that could be cited, have no application. On the contrary, in the House of Lords in England, these very cases, already cited, have been held specifically not to be applicable in any way to the case attempted to be made in the bill now under discussion.

The matter is stated briefly by *Alger on Promoters*, sec. 39, as follows : "It is no objection that the shareholders to whom disclosure is made and who acquiesce in the transaction, do not constitute an independent body, provided the entire capital stock of the corporation has been issued and is held by such shareholders. In such case the assent of all the shareholders is the assent of the corporation, and subsequent shareholders will not be heard to complain, unless the transaction was *ultra vires* the corporation." In *Salomon* v. *Salomon & Co.*, App. cases, (1897) 22, the matter was thoroughly discussed and finally decided. See also *In re Ambrose Lake Tin Co.*, L. R. 14 Ch. Div. 390.

From all of which it is apparent that if any holder of bonds or stock of this Maryland Brewing Company, who purchased the same in the market, whether from the two trust companies, defendants, or from Sperry, Jones & Co., has been deceived by any false representations made to secure the sale, then their remedy is the ordinary remedy following a successful fraud of that kind. But there is certainly no remedy by

the corporation in its organized capacity with respect to the contract made between it and vendors assented to at the time by all its existing stockholders.

*Bernard Carter* (with whom were *Bruce & Fisher* on the brief), for Mercantile Trust and Deposit Co., appellee.

*Fielder C. Slingluff* and *T. Wallis Blakiston*, filed a brief for the Citizens' Trust and Deposit Co., appellee.

SCHMUCKER, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court No. 2, of Baltimore City, sustaining the appellee's demurrer to and dismissing a bill filed by the appellants as Receivers of the Maryland Brewing Company of Baltimore City, hereinafter called " The Company." The purpose of the suit is to procure an account of certain bonds and the proceeds thereof which the bill alleges the appellees, Sperry & Jones, while occupying a fiduciary relation to the company and being in control of its corporate organization, caused to be overissued by it to themselves and which they and their co-appellees, who acted with full knowledge of the facts, sold and disposed of for their own use and advantage. The allegations of the bill in large part relate to the stock of the company which is charged to have been overissued at the same time and in the same manner as the bonds, but there is no prayer in the bill for an account of the stock or its proceeds, although there is a prayer for general relief.

The bill of complaint alleges that the company was incorporated under the General Laws of this State by articles of incorporation filed on February 7th, 1898, and amended on December 22nd, 1898, with a capital of 32,250 shares of preferred and 32,250 shares of common stock and that it subsequently authorized an issue of $7,500,000 of bonds. That the incorporators and directors named in the certificate of incorporation and also the stockholders who participated in the organization of the company consisted of the appellees, Sperry

& Jones, and persons who were under their control and were in fact their agents and were not independent subscribers, and by that means the said two appellees remained in absolute control of the company from its organization down to and including February 28th, 1899.

That pending the organization of the company and prior to the last named date Sperry & Jones, who were bankers and brokers by profession, contracted for and on its behalf with each one of certain named brewers and brewing companies of Baltimore, including George Brehm and Joseph Strauss, to the end that they should sell and transfer their brewing establishment to the company to be paid for by it partly in cash and partly in its bonds and stock at a valuation to be determined by their respective barrelage, or output of barrels of beer, for the preceding year.    That the total capitalization of the company, which was expected to absorb all of the breweries in Baltimore having an estimated output of 700,000 barrels per annum, was fixed in the contracts at $14,000,000 being $20 of capital for each barrel of output, it being further understood that if the entire brewing interests of Baltimore were not brought into the company its capitalization should be reduced, at the rate of $20 per barrel of output of such breweries as failed to come in, such reduction of capitalization to be *pro rata* in bonds and stock.

That it was further provided in the contracts that the several properties should be transferred free of debt to the company, but the latter would buy for cash the stock of malt and hops on hand at the several component breweries as of March 1st, 1899; and further that out of the proceeds of the bonds and stock to be issued by the company a cash working capital of $500,000 should be provided and that the balance of the stock and bonds so to be issued should go to Sperry & Jones as compensation for their services they to pay all of the expenses attending the promotion of the enterprise.    Copies of the alleged contracts between Sperry & Jones and George Brehm and Joseph Strauss were filed as Exhibits " A " and " B " with the bill which alleged that all of the contracts with the other

brewers were similar in terms to the two, of which the copies were filed, and that the other contracts were in the possession of Sperry & Jones.    It was further alleged that all of these contracts were made by Sperry & Jones for and on behalf of the company and provided on their faces that they were to be assigned to and filed with it.

The bill then, after having directly charged that Sperry & Jones in making the contracts with the brewers were acting for and on behalf of the company, proceeds to aver that Sperry & Jones through the said board of directors "did compel the said Maryland Brewing Company on February 28th, 1899, to assume the obligations of the various contracts with various brewers hereinbefore referred to."   *   *.   The bill then further alleges that the various breweries which were in fact transferred to the company, without averring that they were so transferred by virtue of said contracts, represented an output for the preceding year of only 543,000 barrels against which the terms of the contracts would have permitted an issue of only $5,820,000 of bonds and a corresponding amount of stock by the company.   But that the appellees, Sperry & Jones, having control as aforesaid of the company, caused it to issue to them against the said properties $7,500,000 of bonds and $2,750,000 of preferred and $2,750,000 of common stock.

That this issue of bonds and stock was authorized at a meeting of the company held on February 15th, 1899, by the presentation to a stockholder's meeting and the acceptance by the stockholders in such meeting assembled of a written offer from Sperry & Jones to subscribe for and take the above-mentioned amounts of bonds and stock of the company and to pay for $500,000 of the bonds in cash and to pay for the remainder of bonds and stock so to be subscribed for by a transfer and conveyance to the company of certain specified brewery properties at the valuations therein set forth.   A copy of the minutes of said stockholder's meeting showing that all of the stockholders were present in person or by proxy and containing in full the said proposition of Sperry & Jones, is filed with

the bill as Exhibit "C." The bill then charges that this stockholder's meeting had no legal right to receive or accept said proposition because it does not appear that prior notice had been given of the meeting and its purpose as is required by law in such cases.

The bill further charges that the two Trust Companies, which were made co-defendants with Sperry & Jones and which appear in this Court as appellees, with full knowledge of the matters hereinbefore mentioned entered into an agreement with Sperry & Jones to furnish them the sum of $3,800,000 to consummate the promotion of the company for which they received $4,000,000 of the bonds and a large amount of the stock of the company and that they became jointly interested with Sperry & Jones in such promotion and in the transactions connected therewith, and that they subseqently sold said bonds for the sum of $4,240,000, but did not account to the company or its receivers therefor, and that Sperry & Jones failed to account for such of the bonds as were retained by them.

The bill then charges that this alleged over issue and sale and disposal of the bonds and stock of the company procured by Sperry & Jones with the aid and connivance of the two trust companies was a fraud upon the company and its *original stockholders* and its creditors.

The bill further avers that subsequently the company was compelled to default upon its bonds and was, upon a bill filed for that purpose, put in the hands of receivers under secs. 264 and 264A of Art. 23 of the Code and that after a sale of substantially all of its property and effects and the application of the proceeds to the payment of its debts there still remains over $4,000,000 due to its bondholders ; and that the institution of the present suit was authorized by an order of Court passed in the receivership case.

The prayer of the bill is for an account from the defendants of the proceeds of the bonds of the company unlawfully obtained and sold by them or appropriated to their own use and for general relief. The appellees, Sperry & Jones, and

The Citizens' Trust and Deposit Company demurred to the bill and the issue thus made was tried and the decree appealed from, which sustained the demurrers and dismissed the bill, was entered before the time of the other appellee to respond to the bill had expired.

Notwithstanding the positive averment already referred to in the bill that on February 28th, 1899, Sperry & Jones compelled the company to assume the obligations of the contracts with the various brewers, the theory of the bill is that Sperry & Jones acted for and on behalf of the corporation in making the contracts with the brewers and for that reason stood in a fiduciary relation to it and could have no undisclosed interest in the property covered by the contracts nor make any secret profit out of their execution. It is charged that they violated their fiduciary obligation by procuring the company to issue to them a larger amount of stocks and bonds than are called for by the contracts. The case against the two trust companies who are also made defendants to the bill rests upon the allegation that they with full knowledge of the relation of Sperry & Jones to the company and of the terms of the contracts under which the breweries were to be acquired by it not only aided and abetted their co-defendants in securing their alleged secret profits but also shared in the profits.

The allegation of the bill is that all of the contracts with the brewers were similar in their terms to the Brehm and Strauss contracts. Copies of these contracts are filed with and made part of the bill and they constitute the avowed foundation upon which it rests in averring what relation Sperry & Jones occupied to the company in making them and what were the terms and conditions upon which and the extent to which the company was to issue its bonds and stock in payment for the breweries.

It therefore becomes of fundamental importance to ascertain what are the character and scope of these contracts in order to determine whether they, when construed in the light of the other allegation of the bill, and taken together with them, present such a case of breach by Sperry & Jones of a

fiduciary relation to the company as would constitute a suffi-
cient cause of action to maintain the present bill.

If we now turn to the Brehm and Strauss contracts it be-
comes apparent at the first inspection of them that they are
dissimilar in character and proceed upon theories which are
inconsistent if not conflicting with each other.   It cannot be
accurately asserted that all of the other contracts with the
brewers were similar in their terms to these two for these are
not similar to each other.

The Brehm contract recites that Brehm is the owner of a
brewing establishment in Baltimore City and believes that it
would be to his advantage to have his business consolidated
with other breweries so as to effect certain economies and to
produce an annual output of not less than 560,000 barrels
of beer, and that he desires to secure the assistance of Sperry
& Jones in effecting such a combination, and that they are
willing to make an effort to accomplish the desired result.

Sperry & Jones then agree "to give their best efforts to pro-
cure" the desired combination upon the terms briefly outlined
in the earlier part of this opinion and Brehm agrees to sell
and transfer his brewery to the consolidated corporation when
formed, at the fixed price of $1,050,000 to be paid $450,000
in cash, $100,000 in bonds, $250,000 in preferred and
$250,000 in common stock of the company.   But it is pro-
vided by the terms of this agreement that certain breweries
therein named and specified must be embraced within the pro-
posed combination and that the annual output of the com-
bined establishments should not be less than 560,000 barrels
of beer and it is expressly declared that the agreement "*is not
to be binding upon said George Brehm unless the above-enumer-
ated breweries, companies and individuals become part of the
said consolidation.*"

Now the bill nowhere alleges that all of the breweries named
in the agreement did come into the consolidation or that the
annual output of those that came in amounted to 560,000
barrels.   On the contrary it avers that such output was only
543,000 barrels and it appears from Exhibit " C," filed with

the bill that the breweries specified in the Brehm contract did not all come into the company. So it is apparent upon the face of the bill and exhibits that the so-called Brehm contract by its own terms never became a binding obligation or fixed the terms upon which Sperry & Jones were bound to effect the organization of the company, or on which Brehm was bound to convey his brewery to it when organized, or upon which a proposed consolidation of breweries was to be made. Nor does it appear that any attempt was ever made to put this contract into execution. By reference to Exhibit " C " it appears that Brehm's brewery went into the company not at the price of $1,050,000, fixed by this contract, of which $450,000 were required to be paid in cash, but that it went in at the price of $925,000, of which no part was paid in cash, but $400,000 was paid in the bonds and the residue in the stock of the company. Moreover, the brewery was not acquired by the company from Brehm or the price paid by it to him, but it was acquired from Sperry, Jones & Co. in payment for stock and bonds issued to them. Not only, therefore, does it appear from the exhibits that the Brehm contract by its own provisions never become binding and operative but also that his brewery was not acquired by the company from him or under the terms of that contract.

If we turn now to an examination of the contract between Strauss and Sperry & Jones we find that it was one for the out and out sale by the former to the latter of the brewery therein mentioned at the price of $1,100,000, of which $890,000 was to be in the preferred and common stock of the company and the balance in cash or bonds of the company as Strauss might prefer. This contract contains no provision whatever, such as is found in the Brehm contract, stipulating that it is to be assigned to the company or any statement that it was made for its account or on its behalf. The contract does provide that the property to which it relates is to be paid for by Sperry & Jones in bonds and stock of the company which are to be issued by it only to the extent of $20 per barrel of the total output for the preceding year of such brew-

eries as shall be acquired by it, *exclusive of cash or working capital*, but as there is nothing in the contract giving rights under it to any other persons than the contracting parties no right of action would have accrued to the company or to its receiver from a breach of that provision if such breach ever in fact occurred.

There is an allegation in the bill that the various breweries were put into the company under the management of Sperry & Jones at much higher prices than those fixed on them in the contracts with the various brewers, but when we turn to the only contracts produced by the plaintiffs we find that Sperry & Jones turned in the Brehm brewery to the company at a distinctly less price than that mentioned in the contract on which the bill rests its allegations, and that the brewery mentioned in the Strauss contract was turned into the company at precisely the same price as that for which the contract filed with bill shows that he agreed to sell it to Sperry & Jones. The exhibits filed with the bill not only fail to afford reasonable ground for making this allegation but directly contradict it.

Turning now to Exhibit "C" we find that when the breweries in question were finally acquired by the company they were taken by it not from the several brewers who had formerly owned them but from Sperry & Jones, who must in the meantime have acquired them. It is entirely consistent with the exhibits on which the allegations of the bill rest that these gentlemen should have purchased the properties on their own account with a view to capitalize their combined value by turning them into the company in payment for its bonds and stock. The Brehm contract which was on its face made for the benefit of the company was a purely conditional one which was to become operative and take effect only upon the happening of events which the bill alleges never occurred. No inoperative contract like that could create a fiduciary obligation to the company on the part of Sperry & Jones. The Strauss contract is not only consistent with but it in its terms contemplates that Sperry & Jones are to acquire on their own account and not in a fiduciary capacity the property to which it relates.

The bill itself alleges that Sperry & Jones were the real owners of all of the company's stock issued prior to the meeting of February 15th, 1899. There was nothing unlawful in that condition of affairs, in the fact that some of the shares stood in the names of their employees or agents. *Pott & Co.* v. *Schmucker, Trustee*, 84 Md. 535. Nor was there anything unlawful in their subscribing for the remainder of the stock and paying for it by a transfer to the company of the brewing properties at any fair price agreed upon if they owned or controlled and could procure the conveyance of those properties, and complied with the provisions of the law in such cases. The company could also validly purchase property suitable for the purposes for which it was incorporated and issue its bonds or other obligations in payment therefor. The presence of all the stockholders at the meeting of February 15th, 1899, over came any supposed difficulty from want or prior notice of the meeting even though the statute prescribed the notice. *Cook on Corporations*, vol. 2, sec. 599; *Clark & Marshall on Corporations*, vol. 3, p. 1968, and cases cited by those two authors.

The transfer to a corporation, by a subscriber to its stock, of property under such an arrangement as was followed in this case, if the property were valued at a grossly exaggerated price, might it is true not constitute payment in full of the stock so as to protect him from liability to its creditors in a suit brought by them under the provisions of sec. 64, Art. 23, of the Code. *Basshor* v. *Dressel*, 34 Md. 511–512. But this is not a suit of that character.

There could have been, under the conditions of the meeting of February 15th, no concealment of the true situation from any of the real stockholders for they were the same persons as the vendors of the property to the company. It was simply a changing by Sperry & Jones of the form of property owned by them, or under their control for that purpose, from individual estate to corporate securities. The public were not invited to subscribe to any stock. It was perfectly well-known by the parties to the transaction that the full $7,500,000 of

bonds were also being issued for the property.    The bill itself alleges that "there were issued by the Maryland Brewing Company *against the properties* therein set forth $7,500,000" in first mortgage six per cent gold bonds."

When Sperry & Jones afterwards sold or disposed of the bonds and stocks to the brewers or to the public either directly or through the agency of their co-defendants they were bound to exhibit the same candor and practice the same good faith toward the persons with whom they dealt that all vendors are and if they failed to do so they were liable to their vendees in proper proceedings seasonably instituted for damage or for a rescission of the sales as we held in the case of *Brehm* v. *Sperry, Jones & Co.*, 92 Md. 378, but that issue is not presented in this case brought by the receivers.

The proposition that no fraud is involved in the transmutation of property suitable to the purposes of a corporation into the form of corporate securities in the manner adopted by Sperry & Jones in the present instance has been recently decided, after a full examination and discussion of the subject, by the House of Lords in *Salomon* v. *Salomon*, App. Cases 1897, p. 22, and was also adopted in *In re Ambrose Lake Tin Co.*, L. R., 14 Chy. Div. 390.    Mr. Morawetz in sec. 290 of vol. 1 of his work on corporations takes the same view saying : "The vendor of the property in truth took back what he gave. He placed the property in the corporate name, and at the same time practically became the corporation by becoming its sole stockholder.    Evidently no one was injured by that transaction.    If subsequent transferees were deceived by the false representation that the amount of shares had in fact been paid into the treasury of the company, their claims should have been for the damages, caused to themselves individually through the false representation, and not for an infringement of the collective or corporate rights of the shareholders."

There is no real conflict between these authorities and those relied on by the appellant.    In *Gluckstein* v. *Barnes*, L. R. App. 1900, p. 240, and *Erlanger* v. *New Sombrero Phosphate Co.*, L. R., 3 App. Cases, 1218, the promoters had a secret

profit in the land which the corporation was formed to take over, and they issued a prospectus which did not disclose that fact and thereby induced other persons to subscribe to the stock. The same thing is true of the case of the *Yale Gas Stove Co.* v. *Wilcox*, 25 L. R. A. 90, with the aggravation that the promoter who .had a secret profit in the property turned in to the company induced persons to put their money into the enterprise by the false representation that they would stand upon exactly the same basis that he did.

In *Hooper* v. *Central Trust Co.*, 81 Md. 559, Hooper's executors sold a lot of ground to Hammond a promoter to be paid for in part by second mortgage bonds of a corporation to be formed to take over the land. It was agreed as part of the terms of sale that certain things should be done by the corporation tending to give value to the land. The corporation when formed put a first mortgage on the land under circumstances which this Court held to constitute a fraudulent breach of the agreement with the vendors of the land who had taken $100,000 of the second mortgage bonds in part payment for it. Under these circumstances when the corporation defaulted in the interest on its bonds and foreclosure proceedings had been instituted the Court, *upon the petition and cross-bill of the defrauded vendors*, finding that the holders of the first mortgage bonds were not *bona fide holders* gave the second mortgage bonds held by the vendors of the land priority over the first mortgege bonds in the distribution of the proceeds of the foreclosure.

The true test of the responsibility of parties occupying positions such as Sperry & Jones did in putting the brewing properties into the company in this case, is whether other persons than themselves hold stock in the company and are not made aware of the true state of facts, or are induced to come into it by concealment or misrepresentation of the facts, or have furnished all or part of the capital embarked in the enterprise and are misled or kept in the dark as to the actual transaction. In other words, the ground of their liability is the concealment or misrepresentation by those whose duty it is, by virtue of

their relation to the other persons interested in the transaction, to make a full disclosure.

It is a misuse of terms in the present case to say that Sperry & Jones stood in a fiduciary relation to the company at the time they made the contracts with the brewers or when they turned the property into the company in payment for its stock and bonds.   They at that time held all of its stock and were the sole owners of the company.   They were in equity the company itself.   *Swift* v. *Smith, Dixon & Co.,* 65 Md. 428. There was no invitation to others to subscribe for the stock.

The relations of Sperry & Jones to each of the brewers were it is alleged in the bill fixed by a separate contract.   Assuming that these contracts called for the delivery by them to the respective brewers of bonds and stock of the company capitalized upon a certain basis and that they delivered securities issued upon a different basis of capitalization, that might afford to each individual brewer a right of action against Sperry & Jones for such damage as he suffered under the terms of his particular contract, but these *various contract rights* of the different brewers cannot be asserted collectively in this suit by the receiver.

When Sperry & Jones offered any of the bonds, or stock issued to them by the company for barter or sale to other persons and thus as it were invited them to become interested in the enterprise they were bound as we have already said to practice no concealments towards those persons and to give them all desired information as to their own relation to the company, but this like their duty to the contracting brewers, was an obligation to each person with whom they so dealt and the rights of their several vendees in case of a breach of the obligation are several and according to the nature of the particular transaction and cannot be collectively asserted in this suit. In fact the bill does not allege that any of the present bond or stockholders were the original holders of those securities or that they received them from the defendants or from either of them.   Such an allegation has in several cases been held to be necessary to enable a receiver to maintain a suit of this

character even when it is free from the other objections exist-
ing in the present case. *Dimpfel* v. *O. & M. R. Co.*, 110 U. S.
209–10; *Robinson* v. *W. V. Loan Co.*, 90 F. R. 770–2.

We do not think that the bill states a good cause of equita-
ble action in the receiver against Sperry & Jones and still less
does it do so against the other appellees and we will affirm
the decree appealed from.

*Decree affirmed with costs.*